McCORMICK S. S. CO. v. UNITED STATES
et al.
No. 3933–S.

District Court, N. D. California, S. D.
Aug. 14, 1936.

Lillick, Olson, Levy & Geary, Ira S. Lillick, and Joseph J. Geary, all of San Francisco, Cal., for plaintiff.

H. H. McPike, U. S. Atty., of San Francisco, Cal., for defendants.

Before DENMAN, Circuit Judge, and ST. SURE and LOUDERBACK, District Judges.

DENMAN, Circuit Judge.

Petitioner filed a bill praying for a permanent injunction enjoining the Secretary of Commerce from enforcing an order canceling certain rate schedules filed by petitioner with the United States Shipping Board Bureau of the Department of Commerce, and for a decree setting aside, canceling, and annulling the Secretary's order.

Petitioner is a steamship corporation engaged in the intercoastal transport of merchandise between United States ports on the Atlantic and the Pacific on voyages through the Panama Canal. This transportation is carried on by many steamship lines in strong competition. The petitioner found its competitors in intercoastal carriage to United States Puget Sound ports sought to attract certain freights to their companies by establishing through intercoastal rates from and to certain shallow-water ports on Puget Sound, by combining with barge carriers between deep-water ports on the Sound and the shallow-water ports at which their steamers could not discharge, and absorbing the barge transportation cost in their through joint rates.

As a competitive reprisal, petitioner sought to obtain freights upon intercoastal cargo carried between the shallow-water ports of Emeryville and Berkeley on San Francisco Bay and the deep-water docks of San Francisco, by a similar arrangement with barge carriers and similar absorption of the barge cost in the joint carriage.

The ports of Emeryville and Berkeley compete with other ports on the eastern shore of San Francisco Bay—Oakland and Richmond. Deep-water steamers can load and discharge at the ports of Oakland and Richmond. The ports of Berkeley and Emeryville suffer the natural disadvantage

of requiring barge shipment to reach deep-water vessels at San Francisco on the west side of the Bay, that being the point of transhipment for Pacific-Atlantic cargo reaching the wharves of these two shallow-water ports. All of this natural disadvantage was absorbed in the through joint-rate schedules filed by petitioner with the Shipping Board Bureau of the Department of Commerce. Protests were made by competitors of the exporters and importers in Berkeley and Emeryville and, after hearing, the bureau permitted the petitioner's joint rates to stand. They were identical with those to Oakland, Richmond, and San Francisco.

After six weeks' experience in this joint-rate carriage to Berkeley and Emeryville, petitioner became dissatisfied with the arrangement and sought to discontinue it by filing new schedules of joint rates. They covered Oakland and Richmond at the same rates of the prior schedules which had contained the joint rate to Berkeley and Emeryville, but omitted any joint or other rate for intercoastal carriage to and from Berkeley and Emeryville. The industries and public officials in Berkeley and Emeryville protested the approval of the new schedule so withdrawing the joint-rate service to the wharves of these two ports. After hearing the interested parties, the bureau decided against petitioner and ordered it to cancel the later schedules, thus compelling the continuance of the prior schedules for the joint rate service to Berkeley and Emeryville. The petitioner's bill followed and a restraining order was granted.

The effect of the challenged order was that shippers of intercoastal cargo to and from these two ports thus would be entitled to offer petitioner cargo for this transport at the scheduled rates, and, upon refusal to carry, either recover damages (Bowman v. Chicago & N. W. R. Co., 115 U.S. 611, 615, 6 S.Ct. 192, 29 L.Ed. 502) or, if irreparably damaged, compel acceptance of the shipment. Louisville & N. Ry. Co. v. F. W. Cook Brewing Co., 223 U.S. 70, 81, 32 S.Ct. 189, 56 L.Ed. 355.

The defendants make three contentions in support of this compulsive retention of these intercoastal joint rates of petitioner:

(1) The evidence fails to show any intent of the petitioner to discontinue a through service to Berkeley and Emeryville, and hence, since the evidence (they claim) fails to show the rate an unfair one, and no other rate is proposed by petitioner, it is proper to continue the schedules on file;

(2) Petitioner is compelled to continue the service because it and the barge company, the Berkeley Transportation Company, have an agreement for the through intercoastal carriage, still in existence, which, by its terms, continues until its cancellation is approved by the Department of Commerce; and

(3) Congress has given the Department of Commerce the power to compel a steamship line to continue a service even if it be established for no more than six weeks and has developed no trade or industry dependent on its continuance.

(1) *The evidence establishes that petitioner did not intend to continue the through intercoastal service to Berkeley and Emeryville.*

This through service cannot be continued unless there are filed with the Shipping Board Bureau of the Department of Commerce the schedules of rates not only if joint, but also the ship and the barge rates if the carriage to San Francisco and the on-carriage to Berkeley and Emeryville are by separate rates. Not only is the continuance of either form of through service without such filings prohibited by the statute, but violation of the prohibition is punishable by a fine of not less than $1,000 and as large as $5,000 for each offense.

"Every common carrier by water in intercoastal commerce shall file with the United States Shipping Board and keep open to public inspection schedules showing all the rates, fares, and charges for or in connection with transportation between intercoastal points on its own route; and, if a through route has been established, all the rates, fares, *and charges for or in connection with transportation between intercoastal points on its own route and points on the route of any other carrier by water.* * * *

"From and after ninety days following enactment hereof [March 3, 1933], no person shall engage in transportation as a common carrier by water in intercoastal commerce unless and until its schedules as provided by this section have been duly and properly filed and posted. * * *

"Any violation of any provision of this section by a common carrier by water in intercoastal commerce shall be punished by a fine of not less than $1,000 nor more than

$5,000 for each act of violation and/or for each day such violation continues, to be recovered by the United States in a civil action." (Italics supplied.) Section 2, Intercoastal Shipping Act 1933, 47 Stat. 1425, 46 U.S.C.A. § 844.

There can be no clearer evidence of intent of the petitioner not to offer a through service to these two ports than its proposal to withdraw all schedules of rates for carriage to their wharves. It must be presumed, until the contrary shown, that petitioner does not intend to violate the congressional prohibition of the trade or to incur the severe penalties provided. There is no merit in the first contention.

*(2) The contract with the barge carrier does not concern the joint-rate schedule or service sought to be discontinued. Even if it did, Congress has conferred no power on the department to compel its specific performance, unless incidental to a general grant of power to compel an intercoastal carrier to continue the service to any port once it is established.*

This contract contains the following provisions:

"(1) This agreement covers and is restricted to the movement of cargo *under through* bills of lading between United States Atlantic *Coast ports of call* of the McCormick Steamship Company,—namely, Albany, N. Y., Brooklyn, N. Y., Philadelphia, Pa., Baltimore, Md., Norfolk, Va., on the one hand, and Berkeley, California, and Emeryville, California, on the other hand, with transshipment at San Francisco, California.

"(2) The through rates under this agreement are to be those named in the schedules published, posted and filed in compliance with the Intercoastal Shipping Act, 1933, by the parties hereto, *insofar as such schedules provide Terminal port rates to or from Berkeley or Emeryville, California.* * * *

"(6) *Cancellation or any modification of this agreement shall not become effective until approved by the Department of Commerce.*" (Italics supplied.)

This contract applies only to cargo on through bills of lading. It has no application to a service to and from San Francisco with a waybill or other separate carriage by barge to and from Berkeley and Emeryville. The contract shows no intent to establish the latter kind of through service by the two carriers. As shown, the withdrawal of the joint rate evidences the intent not to continue the former.

It will be seen also that this contract applies to cargo carried on the rates in schedules filed under the Intercoastal Shipping Act of 1933, 46 U.S.C.A. § 843 et seq., only "insofar as such schedules provide *Terminal* Port *rates* to or from Berkeley or Emeryville, California." In the terminology of the shipping business as interpreted by the Bureau, rates are of two kinds, "terminal rates" or "joint rates." The order of the Secretary of Commerce is based upon findings made after the hearing before the bureau, and relied on in the brief of the United States. Among these findings is the following: "8. The rates sought to be canceled are *not terminal rates* but *joint rates.*" (Italics supplied.)

This finding accords with the answer of the United States. Whether or not the rates filed with the bureau belong to one classification or the other is a matter of fact. Hence this finding that the rates filed and sought to be canceled are not "terminal rates" established that they are not the rates of the contract between the Berkeley Transportation Company and the petitioner. That contract concerns transportation at rates in filed schedules only "insofar as such schedules provide *Terminal* port *rates* to or from Berkeley or Emeryville, California."

The cancellation or continuance of this contract between the carriers was not considered in the proceedings before the bureau. That considered only the cancellation of the schedules. Even if the contract did concern the schedules of rates actually filed, it is an agreement between the two carriers only. If it be interpreted as requiring a filing of some kind of terminal rates, a breach by failure to file or withdrawal of terminal rates filed is a matter solely of the two carriers' concern. The Berkeley Transportation Company is not a party to this proceeding nor was it to that before the bureau. Neither party to the contract is seeking its cancellation. Between the parties nonperformance by one does not necessarily constitute cancellation. It may be the basis of damages, but such damages would rest on its existence unless, at its option, the barge company should claim an anticipatory breach, which it is not shown to have done. In the absence of claimed anticipatory branch, if, in the future, the petitioner should conclude to re-establish the service and file a terminal

rate, the contract between the two carriers would still bind them.

No authority is shown, and we know of none, which gives to one maritime carrier the right against the other of specific performance of such a contract. Congress has given no specific jurisdiction or power to the department to compel such performance. It cannot be conferred on the department by the mere agreement of carriers. There can be no merit to defendants' second contention, except as specific performance enforced by the department is an incident to some general power given it by Congress, to compel intercoastal carriers to continue the service of a port once it is established.

(3) *Congress had not conferred on the Department of Commerce the power to compel a maritime carrier to continue an established service to any port.*

The fundamental question here is whether Congress has delegated to the Secretary of Commerce or the administrative bureau of his department the power to require the continuance of this intercoastal service, if the petitioner shipping corporation decides, for any reason, to discontinue it. There is no provision in any act of Congress cited to us, nor any which we have been able to discover, which gives to either any power to require a maritime carrier to continue its service to and from the wharves of any port.

In this it is unlike the powers granted to the Interstate Commerce Commission over railway carriers. The reasons for the difference in delegated power over railway as distinguished from sea carriage are obvious. Railways may acquire by eminent domain their routes of transportation and entry into the areas served, and are protected in a complete or partial monopoly of their established traffic unless the Interstate Commerce Commission, after adequate hearing, finds that the admission of competitors in transportation to and from a certain area will add to the convenience of shippers and passengers without undue detriment to the established carriers. The new competing carrier must first secure a certificate of such convenience.

No such powers are granted for the control of transportation on the high seas. Any one can acquire a ship and engage in competition with the established maritime carriers. We take judicial notice of the vigor of this competition and that it at times has been and may be disadvantageous to both carrier and shipper. Whether regulation of this traffic along lines analogous to those of the railways' transportation would be of advantage to shippers and shipping companies is a matter of future concern of Congress.

In interpreting phrases of acts of Congress regulating shipping, which are said to create in the bureau the power to compel the steamship line to remain in the service of a certain port without granting to that company a similar protection against competitors who could take from it the business it had developed, the delegation of such power would have to be made in terms so clear that there is no possible ambiguity or doubt as to such intent.

The case of Lucking v. Detroit & Cleveland Nav. Co., 265 U.S. 346, 350, et seq., 44 S.Ct. 504, 505, 68 L.Ed. 1047, bases its holding on this distinction between congressionally conferred power in the Interstate Commerce Commission to compel continuance of railway service and the absence of such power over common carriers by water. In that case there had been a long-established carriage by rail and water under joint rates, the water carriage being by steamer on the Detroit and Mackinac route. As with petitioner, the Detroit Navigation Company's charter from Michigan did not require its vessels to maintain any particular service. As with petitioner, there was no contract with any shipper to operate on the route in question. Similarly, the Detroit Company had no power of eminent domain or special privilege. The Michigan law compelled rail carriers to obtain permission of the state commission before abandoning a service. No statute imposed a similar obligation on steamship lines. The Supreme Court holds that there is no power under the state law to compel the continuance of the Mackinac-Detroit service. As to the common law the Supreme Court says: "The duty to furnish reasonable service while engaged in business as a common carrier *is to be distinguished from the obligation to continue in business.* No case has been cited by counsel, and we know of none, in which it has been held that there is any common law duty on a common carrier by water not to cease to operate its boats." (Italics supplied.) Lucking v. Detroit & Cleveland Nav. Co., supra, 265 U.S. 346, 350, 351, 44 S.Ct. 504, 68 L.Ed. 1047.

Continuing as to federal control, it considers that for certain purposes the Inter-

state Commerce Commission has supervisory powers over ships, but says:

"But in connection with these provisions, there should be read subdivision (18) of the same section [49 U.S.C.A. § 1 (18)], which provides that no carrier by railroad subject to this act shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity permit such abandonment.

"Carriers by water, such as appellee, are within the terms of the Transportation Act for certain purposes; e. g., for the regulation of their accounts, the making of reports, the prevention of rebates, discrimination, and the like. Certain provisions of the act are applicable to some carriers and not to others. Interstate Commerce Commission v. Goodrich Transit Co., 224 U.S. 194, 208, 32 S.Ct. 436, 56 L.Ed. 729. The imposition of a duty upon a carrier by water to furnish transportation upon reasonable request does not create an obligation to continue to operate boats on a particular route. The provision of subdivision (18) above referred to is specifically limited to lines of railroad. This indicates legislative intention that carriers by water are not required to continue and may cease to operate if they see fit.

"No duty to continue to operate its boats on the Detroit and Mackinac Island route is imposed on appellee by its charter, the statutes of Michigan, the common law or federal statutes." Lucking v. Detroit & Cleveland Nav. Co., supra, 265 U.S. 346, 351, 352, 44 S.Ct. 504, 68 L.Ed. 1047.

The Interstate Commerce Act upon which the Supreme Court there relies provides for all carriers, including ships under the control of the commission: "Section 3, par. (1) *Undue preferences or prejudices prohibited.* * * * to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever." 49 U.S.C.A. § 3.

It is inconceivable that the Supreme Court could have overlooked this provision of section 3 of the Interstate Commerce Act, upon other provisions of which it relies in determining that there was no obligation on the Detroit Navigation Company to continue its service.

In 1921, when the complaint was filed in the Detroit Navigation Company Case, the Act of September 7, 1916 (see 46 U.S. C.A. § 801 et seq.), creating the Shipping Board, had for over four years provided in identical pertinent language that it was unlawful for a common carrier by water: "First. * * * to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever." Section 16, 46 U.S.C.A. § 815.

This act is relied on by defendants in their contention that the "petitioner cannot withdraw its rates and service." They claim that having, for the brief period of six weeks, removed the natural disadvantage of the shallow harbors of Berkeley and Emeryville by absorbing the cost of barge transport to the deep water of San Francisco's docks, it will subject these localities to an "unreasonable" "disadvantage" if the rates and service are discontinued. We can see no merit in the contention and deem it is disposed of by the reasoning of the Detroit Navigation Company Case.

The defendant's briefs cite U. S. v. Illinois Cent. R. Co., 263 U.S. 515, 44 S.Ct. 189, 68 L.Ed. 417; Baer Bros. Mercantile Co. v. Denver & R. G. R. Co., 233 U.S. 479, 34 S.Ct. 641, 58 L.Ed. 1055; Seaboard Air Line Ry. Co. v. U. S., 254 U.S. 57, 41 S.Ct. 24, 65 L.Ed. 129. These are railway cases. None of them deals with the question of the compelled continuance of service. One has to do with claims for overcharges for past carriages of merchandise and establishes that a transport may be a through service though by several connecting lines, each making a different charge. They discuss the right granted to the commission to establish a joint rate for the entire carriage. They deal with the problem of rate discrimination between railroad shippers. None suggests that in the absence of the specific provision of section 20 of the Interstate Commerce Act (49 U.S.C.A. § 20), a six weeks' service to a certain locality, upon which no industry or trade was shown to be established, and which was undertaken in reprisal in a shipping competition, to whose uncontrolled and often destructive vigor the government offered no protection, must continue merely because it momentarily had conferred on the locality in question the benefit of overcoming the natural disadvantage of its shallow waters.

In support of its bill for an injunction, petitioner also raises the question of the

constitutionality of the Act of Congress of June 30, 1932, § 403, 47 Stat. 413 (see 5 U. S.C.A. § 126), authorizing the President to abolish boards like the United States Shipping Board, a separate entity, and transfer the boards' functions to such an executive branch of the government as the Department of Commerce. It is unnecessary to pass on this constitutional question, in view of the conclusions we here reach respecting the power delegated to the United States Shipping Board or its alleged successor, the Department of Commerce, to require the continuance of the joint-rate service to these two shallow-water ports. Liverpool, N. Y. & Phila. S. S. Co. v. Commissioners of Emigration, 113 U.S. 33, 39, 5 S.Ct. 352, 28 L.Ed. 899; Howat v. Kansas, 258 U.S. 181, 184, 42 S.Ct. 277, 66 L.Ed. 550.

The order of the Secretary of Commerce of date August 28, 1935, is unlawful and void and should be set aside, canceled, and annulled, and the enforcement thereof permanently enjoined. The decree should be prepared accordingly.